Filed 6/26/14  P. v. Mraz CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B242704 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA385847) |
| LOUIS J. MRAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Affirmed in part, reversed in part, and modified.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson, Blythe J. Leszkay and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Louis J. Mraz of one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) (count 2),[1] and one count of assault (count 3), as the lesser included offense of the charged crime of assault with force likely to produce great bodily injury (former § 245, subd. (a)(1)). The jury acquitted Mraz of one count of leaving the scene of an accident resulting in injury (Veh. Code, § 20001, subd. (a)) (count 1). As to count 2, the jury found the special allegation that Mraz personally inflicted great bodily injury (§ 12022.7, subd. (a)) to be not true. The trial court sentenced Mraz to the midterm of three years in state prison for count 2, and to a concurrent term of 180 days in county jail on count 3.

On appeal and in a separate petition for a writ of habeas corpus, Mraz contends that the trial court erred by admitting evidence of uncharged conduct, committing three instances of instructional error (involving CALCRIM Nos. 316, 875 & 3404), and imposing erroneous restitution fines for lost wages and attorney fees that were not supported by substantial evidence or legally defensible. He also contends that his counsel provided ineffective assistance. As to each of these contentions, with the exception of a minor modification in the amount of restitution awarded for lost wages, we conclude that the trial court's rulings were proper and no error was committed, and that defense counsel therefore was not ineffective.[2] However, as to Mraz's further contention that he was improperly convicted of both simple assault and assault with a deadly weapon arising out of a singular assaultive act, we agree with Mraz and therefore reverse the judgment of conviction for simple assault on count 3, vacate the concurrent sentence of 180 days in

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     We therefore need not address Mraz's contention regarding cumulative error.

county jail, and also vacate the restitution fines and fees associated with count 3. We otherwise affirm the judgment in its entirety.[3]

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. The Incident

Around 1:30 p.m. on May 27, 2011, Winona Wacker was riding a bicycle in Highland Park on Avenue 50, which had one lane of traffic in each direction. She was riding in the center of her lane because cars were parked to her right and the road was in poor condition. A white Volvo convertible with its top down approached from behind, and the driver honked at her repeatedly. She and the driver, Mraz, exchanged words. Wacker said, "The Vehicle Code gives me a lane for my safety, just calm down." Mraz responded, "Do you want to test your weight against mine?"

A moment later as Wacker passed Buchanan Street, she heard the car accelerate and move diagonally to her left. Her left handlebar was struck by the Volvo's passenger side door just behind the rearview mirror, and she fell to the pavement. She heard the car accelerate and saw it speed off. She did not intentionally hit or swipe at the car as it passed.

Randy Ruiz was driving on Avenue 50 and saw Wacker on the ground about 10 to 15 feet in front of him. Ruiz asked if she needed help and she asked him to get the license plate number of a white car Ruiz saw a block ahead. He followed the car and wrote down the make and plate number, then returned and gave Wacker the information. Wacker gave that information to the police who arrived at the scene shortly thereafter. While testifying, Ruiz admitted that in 2005 he had been convicted of corporal injury to a cohabitant, a misdemeanor.

---

[3] The petition for a writ of habeas corpus is denied in a separate order filed concurrently herewith.

3

Wacker suffered abrasions and bruising to her knees, legs, hand, elbow, wrist, and forearm. She declined having an ambulance summoned. The next day Wacker felt "like a train had hit her." Her back hurt and she felt pain shooting down her legs. At the time of trial, she had gone to several doctors and medical facilities, and had had multiple tests and x-rays performed. She was still receiving physical therapy. Her bicycle was also damaged in the incident. As a result of her injuries, Wacker was unable to perform her job as a camera assistant in the film industry to the extent she had before the incident. She could only work two to three days consecutively, and had to accept only temporary positions. She could no longer sit for long periods of time without experiencing back pain. She was not as physically active as she had been before.

Three days after the collision, Wacker saw the car that had hit her, and noticed three streaks on the passenger side door. A man was driving the car with the top down on York Boulevard between Avenue 50 and Avenue 51.

On June 9, 2011, Los Angeles Police Detective Felix Padilla went to Mraz's home. Detective Padilla identified himself to Mraz, told him he was not under arrest, and asked if Mraz would speak with him in connection with a criminal investigation. Detective Padilla showed Mraz a crime report pertaining to an assault with a deadly weapon. Mraz responded that he recalled an incident that occurred on Avenue 50 in which a bicyclist made a wide turn in front of him and traveled at around five or six miles an hour. She did not pull over and he began honking his horn. He could not pass her because there was oncoming traffic. The bicyclist yelled at him, called him names, and said she had every right to be there. He told her to get out of the way and asked, "Don't you know what a car can do to you?" Mraz pulled up next to her, intending to yell at her, but she smacked the side of his car and he decided simply to pass her. After passing her, he looked in his rearview mirror and saw her still riding along behind him.

Detective Padilla examined Mraz's car and saw no damage to the passenger side door. He wrote down what Mraz told him and had Mraz read the statement. Mraz made some changes and signed the statement.

4

## B.    *Other Crimes Evidence*

Jayme Licuanan was driving his truck on Crane Boulevard in Highland Park one afternoon in April 1999.  As he was traveling uphill on the narrow, two-lane road, his truck stopped and slid back into an embankment.  He attempted to restart it, without success.  Mraz was traveling downhill and was unable to pass Licuanan's truck.  Mraz exited his car and walked over to the driver's side window of Licuanan's truck.  In an "enraged" tone, he told Licuanan to move his truck because he wanted to get going.  Licuanan explained he was trying to start the truck.  Cursing, Mraz reached into the truck as if trying to take the key out of the ignition.  Licuanan blocked his hand.  Mraz punched Licuanan in the face, knocking a lens out of his glasses, then went back to his car.  Some construction workers nearby helped Licuanan move his truck out of the way.  When Mraz drove away, Licuanan wrote down his license plate number.  He reported the incident to the police.

## II.    Defense Evidence

Mraz testified he is an architect who works from his home.  He is 64 years old and wears glasses for nearsightedness.  He suffered a stroke six or seven years earlier that caused him to have "a touch of blindness on the far right side" of his field of vision.

On May 27, 2011, he was driving on Avenue 50 on his way to buy lunch.  A female bicyclist turned from Baltimore Street onto Avenue 50 in front of him.  She was traveling around six or seven miles an hour, in the center of the street.  There were no cars parked on the right side of the street.  There were cracks in the street about one-eighth of an inch wide that ran the length of Avenue 50.  There also was a "trench" that was four inches wide and ran the length of the street, a little over nine feet from the curb, but it had been filled so that it was level with the street.

Mraz observed that the bicyclist looked like she was just learning to ride because her handlebars were weaving left and right and her front wheel also was weaving.  He honked his horn at her repeatedly to get her attention.  She turned and yelled that she had every right to be there.  Mraz could not pass her right away because of oncoming traffic.

5

When it was clear, he pulled into the opposite lane and beside her to pass. He began to yell at her but she started calling him names and he thought, "I got to get out of here." He simply passed her and continued on to the restaurant for lunch. He did not think he had been in a car accident, and he did not attempt to strike the bicyclist.

Mraz admitted that it upset and angered him that she was "driving like a little kid, wiggling her handlebars and going six miles an hour." He yelled at her, asking if she was trying to test her weight against his. He denied hitting her or seeing her and her bicycle go down, saying, "She was still riding when I left."

## DISCUSSION

### I.       Admission of Other Crimes Evidence

Mraz contends the trial court erred in admitting evidence of his conduct involving Licuanan, for which he was convicted of misdemeanor battery in 1999. He contends the evidence was not properly admissible to prove intent, pursuant to Evidence Code section 1101, subdivision (b). We disagree.

#### A.       *The Relevant Proceedings*

The prosecutor sought to introduce evidence of the 1999 incident in which Mraz punched a man whose truck was obstructing the roadway, arguing that it tended to establish intent and lack of mistake or accident. The prosecutor informed the court the victim in the earlier case would testify. The prosecutor argued that "[t]he fact that [Mraz] has attacked someone who blocked him in the past . . . goes to his intent why he approached the bicycle and why it was not an accident." Defense counsel objected to the introduction of this evidence based on the fact the incident happened 13 years before. Counsel asserted the two incidents were not sufficiently similar to establish intent. Counsel further asserted that the evidence was more prejudicial than probative and should be excluded pursuant to Evidence Code section 352.

6

The trial court initially voiced the opinion that the evidence was inadmissible to establish intent. After further argument, however, the court found that the prior incident was sufficiently similar to be admissible, pursuant to *People v. Ewoldt* (1994) 7 Cal.4th 380 (*Ewoldt*), to establish intent. The court found that the remoteness of the other incident did not preclude its admission, and that the evidence was not unduly prejudicial under Evidence Code section 352.

The court expressly limited consideration of the evidence to the intent issue, and instructed the jury accordingly. The jury was instructed pursuant to CALCRIM No. 375 as follows: "The People presented evidence of other behavior by the defendant that was not charged in this case, that the defendant punched Jayme Licuanan. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged act. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant acted with the intent to willfully assault Winona Wacker. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged act[] and the charged offenses. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining if defendant acted with intent to assault Winona Wacker. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime. [¶] If you conclude that the defendant committed the uncharged act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the alleged crimes or that the defendant caused great bodily injury to Winona Wacker. The People must still prove each charge and allegation beyond a reasonable doubt."

*B.* *The Applicable Law*

Evidence Code section 1101, subdivision (a) prohibits admission of evidence of a person's character in the form of specific instances of uncharged misconduct to prove the conduct of that person on a specific occasion. (*Ewoldt*, *supra*, 7 Cal.4th at p. 393.) However, section 1101, subdivision (b) provides that "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such act."

As applicable here, uncharged conduct may be relevant to establish intent if the uncharged conduct is sufficiently similar to the charged crime. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

In addition to determining whether Evidence Code section 1101 requires exclusion of evidence of uncharged misconduct, the trial court must also consider the probative value of the uncharged offense evidence. The probative value must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. (*Ewoldt*, *supra*, 7 Cal.4th at pp. 404-405.)

On appeal, a trial court's resolution of these issues is reviewed for abuse of discretion. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405; *People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.) A court abuses its discretion only when its ruling "falls outside the bounds

8

of reason." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.)  A trial court's ruling will not be disturbed unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Foster*, *supra*, 50 Cal.4th at pp. 1328-1329.)

### C.     *Analysis*

#### 1.     Similarity

Mraz contends that the two incidents were not similar enough to warrant admission of the uncharged conduct.  He points to the trial court's statement that "the conduct that resulted in the offense that's alleged is of a type that presents similarity in terms of force or violence."  In addition, the court elaborated:  "Here, intent requires the least similarity of those items enumerated in [Evidence Code section] 1101[, subdivision] (b).  I find that there is sufficient similarity by virtue of the defendant's alleged conduct in a roadway incident involving the defendant when there was some alleged disagreement with another vehicle operator and alleged force or violence utilized by the defendant as a result thereof."  Mraz argues that the fact both cases involved force or violence was not a sufficient similarity to justify admission of the prior offense.  He asserts that although both the Licuanan and Wacker incidents involved a dispute over a blocked roadway, in one incident Mraz exited his car, tried to take the offending driver's keys from him, and then struck him, whereas he allegedly struck a bicyclist with his car in the present instance.

As previously noted, in proving intent, the least degree of similarity between the uncharged act and the charged offense is required.  (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)  "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]"  (*Ibid.*)  Here, Mraz's exchanging angry words and resorting to violence when he became impatient with Licuanan blocking his progress on a roadway was indeed similar to his exchanging angry words and resorting to violence when he became impatient with Wacker blocking his progress on the roadway.

9

The mode of violence differed because Licuanan was stationary in his car and Wacker was mobile on her bike, but the impetus behind the violence—angry impatience—was the same in each case. We conclude that the evidence of the uncharged conduct was sufficiently similar to the circumstances of the present case to warrant admission. The evidence was highly relevant to prove that Mraz's striking Wacker was an intentional act.

### 2. Intent

Mraz correctly points out that assault is a general intent crime (*People v. Hernandez* (2011) 51 Cal.4th 733, 747) and that the prosecution did not need to prove Mraz acted with a specific intent to cause injury. From this he concludes that "admission of the prior offense [was] even less relevant." We are not persuaded.

"'[A]ssault requires only a general criminal intent and not a specific intent to cause injury. [Citation.]' ([*People v.*] *Williams* [(2001)] 26 Cal.4th [779,] 782 [(*Williams*)].) In order to convict on assault, the jury need only find that the defendant (1) willfully committed an act which by its nature would probably and directly result in the application of physical force against another and (2) was aware of facts that would lead a reasonable person to realize this direct and probable consequence of his or her act. (*Ibid.*) The crime does not require any intent to cause an application of physical force, or a substantial certainty that an application of force will result. (*People v. Colantuono* (1994) 7 Cal.4th 206, 214-220.)"[4] (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186-1187.)

Although the prosecution was not required to prove Mraz harbored a specific intent to cause injury, it had to prove that Mraz acted willfully by intentionally turning his

---

[4] The jury here was instructed pursuant to CALCRIM No. 915 that to prove Mraz was guilty of the crime of simple assault, the People were required to prove that "[Mraz] did an act that by its nature would directly and probably result in the application of force to a person"; "did that act willfully"; "was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone"; and "[w]hen [Mraz] acted, he had the present ability to apply force to a person."

car into Wacker. "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires *an intentional act* and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Williams*, *supra*, 26 Cal.4th at p. 790, italics added.) Evidence of the prior offense was highly relevant as tending to establish that Mraz engaged in the intentional act of turning his car into Wacker.

Mraz relies on language in *Ewoldt*, *supra*, discussing the distinction between the use of evidence of uncharged acts to establish the existence of a common design or plan as opposed to the use of such evidence to prove intent. The *Ewoldt* court noted that "[e]vidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2.) Mraz points out that here the acts were not conceded or assumed: His defense was that the act never occurred and that he never struck Wacker with his car. However, the prosecution was required to both prove (1) that the act of driving into Wacker occurred, and (2) that Mraz acted willfully, i.e., he intentionally acted with actual knowledge of facts sufficient to establish that the act by its nature would probably and directly result in the application of physical force against Wacker. (*Williams*, *supra*, 26 Cal.4th at p. 790.) Evidence of the prior offense was highly relevant to the latter inquiry. If the jury concluded the act occurred, Mraz's intent in performing that act (and the absence of mistake or accident) remained in dispute.

### 3. Remoteness

Mraz also points out that the prior incident with Licuanan occurred in 1999 and he lived a blameless life between then and the time of the charged crime. While this factor is to be taken into account by the trial court in deciding whether to admit evidence, it is by no means decisive. We disagree with the contention that the remoteness of the prior

11

conduct was "a very substantial factor favoring exclusion." (Cf. *People v. Harris* (1998) 60 Cal.App.4th 727, 739-741 [evidence should have been excluded where 23 years had passed since prior conduct, which conduct the appellate court also found to be lacking in any significant probative value].)

        4.     <u>Prejudice</u>

"It is important to keep in mind what the concept of 'undue prejudice' means in the context of [Evidence Code] section 352. '"Prejudice" as contemplated by section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. . . . "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" [Citation.]'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.) We conclude that the Licuanan evidence was not unduly prejudicial. It was no stronger nor more inflammatory than the evidence regarding the current crime. Although Mraz exited his car and physically punched Licuanan, in this case he was accused of using his *car* to run into Wacker. Under these circumstances the likelihood the jury was inflamed by Licuanan's testimony is minimal.

In addition, we note that "[t]he probative value of evidence of uncharged misconduct also is affected by the extent to which its source is independent of the evidence of the charged offense. For example, if a witness to the uncharged offense provided a detailed report of that incident without being aware of the circumstances of the charged offense, the risk that the witness's account may have been influenced by knowledge of the charged offense would be eliminated and the probative value of the evidence would be enhanced." (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) Here the evidence was entirely independent in that Licuanan reported the crime at the time it occurred. We

conclude there was no abuse of discretion in the trial court's conclusion that, on balance, evidence of the prior incident was more probative than prejudicial and was properly admissible. In view of our conclusion that admission of the evidence was proper, we need not discuss whether its admission constituted harmless error.

## II. CALCRIM No. 316 Regarding Effect of Prior Conviction on Witness Credibility

The jury was instructed pursuant to CALCRIM No. 316, without objection, that "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

Mraz contends on appeal and in a separate petition for habeas corpus that the trial court erred by instructing the jury using CALCRIM No. 316 without further instructing the jury, *sua sponte*, that its application was limited to witness Randy Ruiz, who admitted to suffering a prior misdemeanor conviction for corporal injury on a cohabitant. Mraz also had suffered a prior conviction for misdemeanor battery (the Licuanan incident), although the jury was not informed that he was convicted of misdemeanor battery arising out of those events. Mraz contends the instruction as given impermissibly permitted the jury to consider his prior battery offense in assessing the believability of his testimony. We disagree.

We first note that we consider this claim despite forfeiture by defense counsel by failing to request modification of the instruction, in order to address simultaneously the contention by Mraz that his counsel provided ineffective assistance. To demonstrate ineffective assistance of counsel, a defendant must show "'counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, [a defendant] must also show prejudice flowing from counsel's performance or lack thereof.

13

[Citations.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*In re Avena* (1996) 12 Cal.4th 694, 721; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) However, the assessment of prejudice is not limited to outcome determination, and instead it involves determining whether counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. (*Avena*, *supra*, 12 Cal.4th at p. 721.) "[T]he petitioner must establish 'prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.'" (*In re Clark* (1993) 5 Cal.4th 750, 766.) Where a defendant fails to show prejudice, a reviewing court may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (*Strickland*, *supra*, 466 U.S. at p. 697.) As we explain, we conclude that even if we assume that counsel's performance was deficient by failing to request modification of CALCRIM No. 316, Mraz cannot establish prejudice.

"'"'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" [Citations.]' (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)" (*People v. Smithey* (1999) 20 Cal.4th 936, 963-964 (*Smithey*).) Thus, in reviewing this claim, we look to the instructions as a whole to determine whether there is a reasonable likelihood that the jury misunderstood CALCRIM No. 316 so as to use evidence of Mraz's prior misdemeanor battery conviction for purposes of judging Mraz's credibility. (*Smithey*, *supra*, at p. 963.) As discussed above, the Licuanan incident was admitted pursuant to Evidence Code section 1101, subdivision (b) to prove intent, not for purposes of impeachment. In that regard, the court expressly limited the jury's consideration of the evidence to "deciding whether or not[] [t]he defendant acted with the intent to willfully assault Winona Wacker. [¶] . . . [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining if the defendant acted with intent to assault Winona Wacker."

14

We find no reasonable likelihood that the giving of CALCRIM No. 316 without modification to spell out that it applied only to Ruiz caused the jury to disregard the very specific instruction given a few moments later limiting the jury's use of the evidence that Mraz punched Licuanan. Indeed, we presume that jurors follow limiting instructions they are given. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Our conclusion that no prejudice resulted from the court's giving the instruction as stated above is strengthened by the fact that the jury heard Ruiz had been convicted of corporal injury to a cohabitant, a misdemeanor, and did not hear that the Licuanan incident resulted in a criminal conviction. Thus, the jury was likely to think only of Ruiz when it was instructed that if a witness "has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony."

In addition, while the prosecutor argued to the jury that it could look at the Licuanan incident to assist it in "judg[ing] credibility," he immediately clarified that one of the instructions would direct them to decide whether Mraz "acted with the intent to willfully assault Winona Wacker based on that prior incident." He concluded, "[Mraz] testified he didn't even hit her. Can you believe that, when back in 1999, when somebody else was blocking the road, he actually got out of his vehicle and punched the person. No, you can't believe anything the defendant said." We agree with respondent that, in referring to the language of CALCRIM No. 375, the prosecutor was properly arguing that the prior conduct was relevant for the limited purpose of deciding intent, rather than making an improper reference to Mraz's credibility.

In short, we find no error with regard to the giving of unmodified CALCRIM No. 316, and no discernible prejudice from it given the instructions when viewed as a whole. Mraz has not shown there is a reasonable probability that, but for CALCRIM No. 316 being given as it was, the result of the proceeding would have been different.

## III. CALCRIM No. 3404 Regarding Accident

Mraz next contends that the trial court erred by refusing to instruct the jury as requested by defense counsel with CALCRIM No. 3404. As requested it would have

15

instructed the jury that "The defendant is not guilty of [assault] if he acted or failed to act without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of [assault] unless you are convinced beyond a reasonable doubt that he acted with the required intent." (CALCRIM No. 3404.) In refusing the instruction the court found that based on the testimony of Mraz and Wacker there was no substantial evidence to support giving the instruction. Applying a de novo standard of review (*People v. Waidla*, *supra*, 22 Cal.4th at p. 733), we agree with the trial court's assessment that there was no substantial evidence to warrant giving the instruction.

The so-called defense of accident is actually a claim the prosecution has failed to prove the intent element of the crime. "A trial court's responsibility to instruct on accident . . . generally extends no further than the obligation to provide, upon request, a pinpoint instruction relating the evidence to the mental element required for the charged crime." (*People v. Anderson* (2011) 51 Cal.4th 989, 997, italics omitted.) "A trial court must give a pinpoint instruction, even when requested, only if it is supported by substantial evidence. [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 214-215.) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt."'" (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Thus, if there was evidence sufficient to establish that Mraz acted accidentally in striking Wacker, the instruction should have been given. But there was no such evidence. Mraz flatly denied that he struck Wacker at all. He admitted he was angry at her and that he asked if she wanted to test her weight against that of his car, but said he simply passed her and drove away. He said he did not think he had been in an accident, and told the investigating detective that after passing her, he looked in his rearview mirror and saw her still riding behind him. At trial he denied hitting her or seeing her and her bicycle go down, saying, "She was still riding when I left."

Wacker testified that she and Mraz exchanged angry words, and that Mraz asked her, "Do you want to test your weight against mine?" Mraz then drove toward her at a

diagonal, and his passenger side door struck her left handlebar, causing her to fall to the pavement. She heard the car accelerate and saw it speed away.

In view of the very different testimony of Mraz and Wacker—Mraz specifically denied being involved in an accident and said Wacker was still riding as he drove away, while Wacker said Mraz drove his car toward her and struck her—the evidence clearly was insufficient to require the giving of the requested instruction regarding accident. Either Wacker fell after Mraz passed her, for reasons independent of anything Mraz did, or she fell because Mraz intentionally drove his car toward her. There was no evidence that Mraz accidentally drove toward her or accidentally struck her. We thus conclude that the trial court correctly refused to instruct the jury on accident.

In addition, we note that the jury's verdict finding Mraz guilty of assault with a deadly weapon necessarily resolved the question of accident adversely to defendant by concluding he was guilty of a willful act. The jury was instructed by way of CALCRIM No. 875 that to prove assault with a deadly weapon, the People were required to prove that Mraz acted willfully or on purpose in applying force to a person. It undoubtedly would have returned the same verdict had it been instructed regarding accident. (See *People v. Anderson*, *supra*, 51 Cal.4th at p. 997.) Even if we were to find the failure to instruct on accident constituted error, we would find the error to be harmless under even the more rigorous *Chapman*[5] standard requiring proof that an error is harmless beyond a reasonable doubt. (See *People v. Salas* (2006) 37 Cal.4th 967, 984.)

## IV. CALCRIM No. 875 Regarding Assault With a Deadly Weapon

### A. "Deadly Weapon, to Wit: Car"

Although a car is not an inherently deadly weapon, "[t]he law makes clear a person who operates or drives a vehicle in an attempt to injure another person has committed assault with a deadly weapon, to wit, the car." (*People v. Russell* (2005) 129 Cal.App.4th 776, 782, fn. omitted.) In the instant case, with respect to the charge of

---

[5] *Chapman v. California* (1967) 386 U.S. 18, 24.

assault with a deadly weapon, the trial court made two modifications to CALCRIM No. 875 that, according to Mraz, withdrew from the jury's consideration whether he used his car in a manner that qualified it as a deadly weapon.[6]  First, in describing the charge, the trial court instructed that Mraz was "charged in Count II with Assault With a Deadly Weapon, *to Wit: Car*" as opposed to how the unmodified instruction would have read ("assault with a deadly weapon *other than a firearm*").  (Italics added.)  Second, in describing the first element of the crime, the court instructed that the People had to prove that "[t]he defendant did an act with a deadly weapon *to wit:  a car*, that by its nature would directly and probably result in the application of force to a person," as opposed to how the unmodified version would have read  ("an act with a deadly weapon *other than a firearm* that by its nature would directly and probably result in the application of force to a person").  (Italics added.)

According to Mraz, these modifications removed from the jury's consideration the issue of whether his car qualified as a deadly weapon under the circumstances of the present case.[7]  We disagree.  In reviewing this claim, we look to the instructions as a whole to determine whether there is a reasonable likelihood that the jury misunderstood CALCRIM No. 875 so as to withdraw an element of the crime from the jury's consideration.  (*Smithey*, *supra*, 20 Cal.4th at p. 963.)

Here, the instruction given to the jury read in relevant part:  "The defendant is charged in Count II with Assault With a Deadly Weapon, to Wit:  Car.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant

---

[6]     CALCRIM No. 875 states in relevant part as follows:  "To prove that the defendant is guilty of this crime, the People must prove that:  [¶] (1) The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; [¶] (2) The defendant did that act willfully; [¶] (3) When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] (4) When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person."

[7]     Mraz also raised this issue in his petition for writ of habeas corpus.

18

did an act with a deadly weapon[,] to wit:  a car, that by its nature would directly and probably result in the application of force to a person . . . ."  The instruction also defined the term "deadly weapon" as follows:  "A deadly weapon other than a firearm is any object, instrument or weapon that is inherently deadly or dangerous or one that is used in such a way that is capable of causing and likely to cause death or great bodily injury."

In context, the trial court's modifications simply informed the jury that the alleged deadly weapon in this case was a car.  The instruction still left to the jury the determination whether the car was in fact used as a deadly weapon.  Indeed, the entire theory of the prosecution, as explained in the prosecutor's argument, was that Mraz used his car in a manner that was capable of causing great bodily injury or death to Wacker (e.g., "Some people have trouble sometimes when they hear an every day object like a car can be considered a deadly weapon, but it can be.  If you're hit by a car, it can hurt you, it can kill you.").  There is no reasonable likelihood that the jurors misunderstood the instruction to mean that a car is, as a matter of law, a deadly weapon, and that they need not determine under the evidence whether in fact it qualified as a deadly weapon under the definition given.[8]

> B.    *"Inherently Deadly or Dangerous"*

In *People v. Brown* (2012) 210 Cal.App.4th 1, 8, the court found fault with the version of CALCRIM No. 875 given in this case, to the extent it defined deadly weapon to include "'any object, instrument, or weapon that is inherently deadly or *dangerous*.'"[9] According to *Brown*, this formulation "may impermissibly allow a jury to convict a defendant of assault with a deadly weapon if it finds the weapon employed was

---

[8]    Because we reject the claim on the merits, we need not discuss respondent's forfeiture argument or Mraz's claim that his attorney was ineffective for failing to object to the modifications to CALCRIM No. 875.

[9]    CALCRIM No. 875 has since been modified to refer only to "any object, instrument, or weapon that is inherently deadly," deleting the reference to inherently dangerous.

*inherently dangerous*, even if it rejects the notion that the instrument was inherently deadly or used in a manner capable of causing and likely to cause death or great bodily injury." (*Id*. at p. 11, italics added.) The court recognized, however, that the distinction is important only in a "narrow category of cases" involving weapons or instruments (such as the BB gun involved in *Brown*) that, although inherently dangerous, are not inherently deadly. (*Ibid*.)

Relying on *Brown,* Mraz contends that the definition of deadly weapon given in this case permitted the jury to convict him if it found that the car was an inherently dangerous weapon. He also contends that the definition improperly permitted the jury to convict him if it found the car was an inherently deadly weapon. However, any error was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

The prosecution presented one theory of guilt: that Mraz used the car as a deadly weapon, driving it in a manner likely to cause death or great bodily injury to Wacker. That was the theory portrayed by the prosecution evidence and argument. Moreover, defense counsel did not contest the fact that the car, if driven in the manner described by Wacker, constituted a deadly weapon. The defense theory, as described in Mraz's testimony, was that he did not intend to and did not strike Wacker with his car and that she was still riding as he drove around her. Further, the instruction as given required the jury to find that Mraz "did an act with . . . [the car] that by its nature would directly and probably result in the application of force to a person." Obviously, driving a motor vehicle in a way that would directly and probably result in the application of physical force to a person is a use of that motor vehicle that is almost certainly capable of causing and likely to cause death or great bodily injury. Under these circumstances, the inclusion of the phrase "inherently deadly or dangerous" in the definition of deadly weapon did not affect the verdict.

## V. Conviction for Simple Assault as Lesser Included Offense Must Be Reversed

Mraz contends, and respondent concedes, that he was improperly convicted of and sentenced for both assault with a deadly weapon in count 2, and also simple assault as a

20

lesser included offense of assault with force likely to produce great bodily injury in count 3. While it was proper for the People to charge him in two separate counts with two different offenses,[10] both of which are described in section 245, subdivision (a), it was erroneous for Mraz to be convicted of and sentenced for both counts because he was alleged to have committed only one assaultive act. As respondent also concedes, there was no evidentiary support for two separate convictions because Mraz was alleged to have committed only one act: driving his car toward Wacker. The simple assault for which he was convicted in count 3 was necessarily included in the assault with a deadly weapon for which he was convicted in count 2. We therefore vacate the conviction for simple assault as well as the sentence of a concurrent term of 180 days in county jail as to count 3. We also strike the $100 restitution fine (§ 1202.4, subd. (b)), the $40 court security fee (§ 1465.8), and the $30 criminal conviction assessment (Gov. Code, § 70373) imposed by the court as to count 3, as reflected in the court's minute order and the abstract of judgment.

## VI.     Restitution

The trial court ordered Mraz to pay $35,077.40 in direct victim restitution for Wacker's lost wages, as well as $12,000 in attorney fees to a private attorney retained by Wacker who assisted the People in seeking restitution. Mraz contends the amount of lost wages the trial court awarded was not supported by substantial evidence, and that the award of attorney fees was erroneous because Wacker did not prove she actually incurred the fees and because the private attorney's work was unnecessary and duplicative. We reject each of these contentions.

---

**10**     Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court . . . ."

21

Section 1202.4, subdivision (a)(1) provides: "It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." Subdivision (a)(3) provides that "[t]he court, in addition to any other penalty provided or imposed under the law, shall order the defendant to pay both of the following: [¶] (A) A restitution fine in accordance with subdivision (b). [¶] (B) Restitution to the victim or victims, if any, in accordance with subdivision (f), which shall be enforceable as if the order were a civil judgment." Subdivision (f) provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." Restitution may include, among other things, lost wages and "[a]ctual and reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim." (§ 1202.4, subd. (f)(3)(E) & (H).)

Victim restitution is intended not only to compensate victims of crimes, but also to rehabilitate the offender and deter offenders and others. (*People v. Bernal* (2002) 101 Cal.App.4th 155, 161-162, citing *People v. Crow* (1993) 6 Cal.4th 952, 957. See also *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386.)

We review a trial court's order of victim restitution for an abuse of discretion. The trial court is afforded broad discretion in calculating an amount of victim restitution. (*People v. Giordano* (2007) 42 Cal.4th 644, 663-664.) No abuse of discretion will be found when there is a factual and rational basis for the amount of victim restitution ordered by the trial court. (*People v. Baker* (2005) 126 Cal.App.4th 463, 467.)

### A. *Lost Wages*

Wacker testified and also submitted a declaration to the trial court stating she works as a camera assistant for movie and television productions on an independent contractor basis. In late 2011, she declined an offer of employment that would have lasted eight to 10 weeks because after the assault she felt physically unable to perform the

22

tasks required for the job. The job involved working on a movie shoot in the Bay Area that was to be filmed at the beach, which would be physically more demanding because it involved working in sand and water. She claimed lost wages in the amount of $40,739.48. Wacker accepted other jobs during the same time period that movie was shooting and received the same daily pay she would have received working on the movie, but she only worked about two days per week because she needed to let her body recover between jobs. She could not remember precisely how many days she worked, but stated that "normally I would [work] two days and then have the rest of the week off to recover." None of her doctors said she could not work or had particular restrictions on her work. However, she felt the doctors did not understand the physical nature of her job which involved carrying heavy camera equipment.

Wacker indicated that if she worked on the movie in the Bay Area she would have been paid $707.76 per day, five days per week, for 10 weeks, or $35,388. She also would be paid for "idle days" an additional two days per week for out-of-town jobs. For the job at issue, there would have been at least 16 idle days, probably more. She calculated lost pay for idle days using the minimum number of days (16), at $39.32 per hour, times four hours per day, for a total of $2,516.48. She also would have been entitled to receive a daily per diem of $45 to $60 per day. She used the lower figure, $45, and multiplied it by nine weeks (or 63 days) to arrive at the figure $2,835. Totaling those figures resulted in a lost wage claim of $40,739.48. She also would have been entitled to receive a housing allowance but she declined to include that amount in her request for lost wages. Wacker also lost other jobs as a result of the assault but was not seeking compensation for those jobs.

At the urging of defense counsel, the trial court offset the amount of Wacker's lost wages by the amount she earned on other jobs during the time period the movie was being shot. The trial court accepted the prosecutor's suggestion to deduct wages for two days per week for nine weeks, at the rate of $314.56 per day. This resulted in a restitution order for lost wages of $35,077.40.

23

Mraz contends on appeal that there was no substantial evidence to support the court's finding that Wacker was physically disabled by the assault such that she could not accept the job in the Bay Area because she admitted her doctors had not found her to be disabled. On appeal and in his habeas petition, Mraz also contends that the court started out with the figure of $40,739.48, which represented 10 weeks' wages, but only offset that amount by nine weeks' wages working two days per week. He argues the court should have offset the amount of restitution by 10 weeks' wages (20 days at the rate of $314.56 per day, or $6,291.20) instead of nine weeks' wages (18 days at the rate of $314.56 per day, or $5,662.08), resulting in an award for lost wages of $34,448.28. Mraz further contends that because "Wacker did not actually have to go out of town, . . . she should not have been given compensation for the 'per diem' allowance for expenses she did not incur."

First, we conclude that the trial court had before it substantial evidence to find that Wacker's physical condition as a result of the assault precluded her from accepting employment filming the movie in the Bay Area. She testified she could only work a couple of days in a row and then needed time to recover. She also testified that the Bay Area shoot was uniquely challenging because it involved filming in sand and water, making it too difficult for her to accept the job. It was not necessary for Wacker to present evidence that a doctor had declared her to be disabled; her testimony regarding her condition and abilities was sufficient. The uncorroborated testimony of a single witness is sufficient to establish a fact unless the testimony is physically impossible or inherently improbable. (*People v. Scott* (1978) 21 Cal.3d 284, 296 [uncorroborated testimony of a single witness is sufficient to sustain conviction].) A lay witness may give opinion testimony regarding her own health, physical limitations, or condition without the necessity of corroborative expert opinion. (See *People v. Smith* (1976) 59 Cal.App.3d 751, 754-755, disapproved on other grounds as stated in *People v. Davis* (1994) 7 Cal.4th 797.)

Next, we find there was substantial evidence to support the trial court's decision to offset the lost wages by deducting wages for two days per week. Wacker testified that,

during the time period at issue, "normally I would [work] two days and then have the rest of the week off to recover." That alone constituted substantial evidence on which the court rationally based its determination to offset the wages Wacker would have earned on the movie by two days' wages per week.

However, we agree with Mraz that the offset should have been for two days of work per week for 10 weeks, rather than nine. The court said it felt "the fairest approach is to take those days that she was employed and to deduct it from the claim that she is making for $40,000, and I think that's a reasonable basis for her to be made whole." The trial court accepted the prosecutor's suggestion that they offset the award by nine weeks' pay at two days per week, saying, "The court will accept the estimate provided by the People and award the victim in this matter[] lost wages in the sum of $35,077.40."[11] A reasonable assumption is that if the court had been aware the $40,000 claim was for 10 weeks, it would have offset the award for 10 weeks' wages by an equivalent number of weeks at the rate of two days per week. We therefore order the award of lost wages to be reduced to $34,448.28 to take into account the offset of an additional two days' pay.

Finally, we reject Mraz's argument that Wacker should not have been awarded the per diem pay because she did not actually have to go out of town and did not incur expenses. Simply put, we find that had she not been injured, Wacker would have been able to accept the employment at issue and would have been entitled to collect the per diem. To make her whole, she is entitled to recover the per diem pay she would have received.

### B. Attorney Fees

As previously noted, restitution may include "[a]ctual and reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim." (§ 1202.4, subd. (f)(3)(H).) Accordingly, the trial court awarded Wacker $12,000 in

---

[11] The record reflects that both the prosecutor and defense counsel referred to a nine-week timeframe in their arguments regarding offset of pay even though her claim was for a 10-week period.

attorney fees, reducing the award from the sum requested by Wacker, based on its finding that certain of the fees were excessive or unnecessary.

Mraz contends that "there was no evidence presented to show that Ms. Wacker had any legal obligation to pay [her private attorney] Hirsch for his services, or what the terms of any such agreement were." (Italics and fn. omitted.)  He argues that because Hirsch referred to their agreement as a contingency fee arrangement, there was no evidence that Wacker incurred any legal fees.  Mraz also points out that there was no evidence that Hirsch helped Wacker recover a settlement in a separate civil action.  (Cf. *People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409-1410; *People v. Fulton* (2003) 109 Cal.App.4th 876, 889; *People v. Taylor* (2011) 197 Cal.App.4th 757, 763.)  He argues Hirsch simply replicated the District Attorney's office's actions in obtaining restitution for Wacker.  We disagree with each of these contentions.

In the civil context, "it has been generally agreed that a party may 'incur' attorney fees even if the party is not personally obligated to pay such fees.  'A party's entitlement to fees is not affected by the fact that the attorneys for whom fees are being claimed were funded by governmental or charitable sources or agreed to represent the party without charge.'"  (*Lolley v. Campbell* (2002) 28 Cal.4th 367, 373.)  "[I]n cases involving a variety of statutory fee-shifting provisions, California courts have routinely awarded fees to compensate for legal work performed on behalf of a party pursuant to an attorney-client relationship, although the party did not have a personal obligation to pay for such services out of his or her own assets."  (*Ibid.*, fn. omitted; see also *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1127, 1131 [awarding attorney's fees to an indigent defendant represented on a pro bono basis in SLAPP suit under Code Civ. Proc. § 425.16].)  "Our appellate courts have repeatedly affirmed awards of attorney fees under various fee-shifting provisions for legal services provided at no personal expense to the client."  (*Lolley*, *supra*, 28 Cal.4th at p. 374.)  Mraz has not presented argument or authority to persuade us that a contrary interpretation of section 1202.4, subdivision (f)(3)(H) is warranted here.  Regardless of whether Wacker's arrangement with Hirsch involved a

26

contingency fee agreement, we conclude that Hirsch's attorney fees were properly included in the restitution order.

Similarly, the fact that Wacker did not file a separate civil action to seek to recover her losses is of no consequence. Indeed, Mraz benefited from Wacker's not filing a civil suit and incurring additional costs in doing so. A civil suit was unnecessary because section 1202.4, subdivision (a)(3)(B) specifically requires a trial court to order "[r]estitution to the victim or victims, if any, in accordance with subdivision (f), *which shall be enforceable as if the order were a civil judgment*." (Italics added.)

Finally, as to whether Hirsch's efforts were unnecessary or duplicative, Mraz has not demonstrated that the trial court abused its discretion in determining that Hirsch's fees, as reduced by the trial court, were reasonably incurred. The trial court was in the best position to determine the value of Hirsch's efforts. The court rightfully rejected defense counsel's contention that recovery of restitution is the district attorney's job and there should be no attorney fees awarded to private counsel (citing *People v. Dehle*, *supra*, 166 Cal.App.4th 1380, and *People v. Smith* (2011) 198 Cal.App.4th 415). Other than generally objecting to an award of fees, Mraz complains that almost $6,000 in fees was attributed to communicating with Wacker, and another $3,883 was attributed to Hirsch's attendance at hearings, even though the deputy district attorney represented Wacker's interests at those hearings. However, communicating with Wacker was the reasonable means by which Hirsch would have ascertained information regarding her economic losses. In addition, although Hirsch was not permitted to represent Wacker at the restitution hearing, he was permitted in the trial court's discretion to assist the People with presenting evidence regarding Wacker's request for restitution. (*People v. Dehle*, *supra*, 166 Cal.App.4th 1380.) We find no abuse of discretion in the trial court's award of $12,000 in attorney fees for Hirsch's services.

27

## DISPOSITION

We reverse the judgment of conviction for simple assault, vacate the associated sentence, and vacate the restitution fines and fees imposed in relation to count 3. We reduce the restitution award for lost wages to $34,448.28 and otherwise affirm the judgment in its entirety. The superior court is directed to prepare an amended abstract of judgment reflecting the views expressed herein, and to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.